UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PERCY CUMMINGS,

        Plaintiff,

v.

UNKNOWN WALTON, *et al.*,

        Defendants.

                              /

Case No. 1:14-cv-932

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

        This is a *pro se* action brought by a state prisoner in the custody of the Michigan Department of Corrections (MDOC), which the Court construes as brought pursuant to 42 U.S.C. § 1983 and state law.  This matter is now before the Court on defendants' motion for summary judgment (docket no. 12).

        **I.**        **Plaintiff's complaint**

        Plaintiff has alleged that the following defendants violated his civil rights and state law while he was incarcerated at the E. C. Brooks Correctional Facility (LRF): Deputy Warden Sherry Walton; Warehouse Supervisor Kelly Cyr; Corrections Officer (CO) Gary Williams; CO Donald Maschino; and CO Ray Coucke.  Plaintiff's complaint consists of multiple documents, including a form prisoner civil rights complaint (docket no. 1, PageID.4), a separate "civil rights complaint" (docket no. 1, PageID.5-9), and a number of attachments (docket no. 1-1, PageID.10-26).

        Plaintiff set forth the following allegations.  In September 2011, plaintiff was employed as an "Industrial Laundry Worker" for Michigan State Industries ("MSI") with "a good work reputation that promoted him to a higher pay rate." Compl. at PageID.3.  On September 14,

2011, plaintiff was assigned to supervise the Veterans Hospital Intake shakeout table (the "Vets table") in the presence of defendants Cyr, Williams and Maschino and security cameras "installed to promote safe and secure operations over the sorting table." *Id.* The table is a high risk table because outside contraband comes in regularly. *Id.* MSI installed a drop box for known or suspected contraband to be placed. *Id.* On this date, a handbag with personal property and money was brought to the front of the table. *Id.* Plaintiff could not place the large handbag through the dropbox slot, so it was placed on top of the dropbox. *Id.* Moments later, an inmate took the handbag and "secreted it to places unknown." *Id.* At the next break period, plaintiff reported the theft to defendant Maschino by a written kite. *Id.* Staff searched the area and found the handbag empty. *Id.* The Vets table crew was rounded up, strip searched and sent back to the housing units. *Id.* at PageID.6-7. Supervisory personnel told plaintiff that he would be back to work because he followed policy. *Id.* at PageID.7.

On September 22, 2011, plaintiff was placed on "Double '00' unemployable status." *Id.* He grieved this as a wrongful termination from his prison work assignment. *Id.* at PageID.7. However, the grievance attached to the complaint upon which plaintiff relies to support his claim, LRF-11-12-2233-13z ("2233"), did not address this incident. Rather, this grievance was directed at only one of the defendants (Cyr), and complained of an incident which occurred over two months later, on December 29, 2011, in which Cyr subjected plaintiff to personal abuse contrary to Policy Directive 03.03.130(J). Grievance 2233 (docket no. 1-1, PageID.11). The grievance was denied because on that date, plaintiff violated the working rules of MSI and was issued a counseling memo for "Loitering or Not Working as Assigned." *Id.* at PageID.102.[1]

---

[1] *See* discussion of Grievance 2233 in § II.B.3, *infra*.

2

Plaintiff also alleged that during a "grievance interview," defendant Deputy Warden Walton called MSI to confirm plaintiff's facts and told plaintiff that "[s]ince your story checks out you will go back to work." *Id.* at PageID.7. Plaintiff returned to his prison work assignment for two months "at starting pay" and then transferred out of the facility. *Id.* Plaintiff was transferred from LRF sometime after November 22, 2011. *Id.*

Plaintiff's only claim against defendant Walton is that she called MSI and told plaintiff that he would go back to work. *Id.* With respect to defendants Cyr and Coucke, plaintiff alleged that they committed state torts, specifically negligence, by failing to maintain safe operating protocol, to ensure operable security cameras, to adjust manpower in the absence of working cameras, and to maintain "ethical and confidential work exchanges in conformity with the Whistle Blower Protection Act," and provided false termination reports "to justify and cover-up unprofessional breaches of security." *Id.* at PageID.7-8. In a similar vein, plaintiff alleged that defendants Williams and Maschino committed state torts, including negligence and being "derelict" for failing to inform maintenance of faulty security camera operation and failing to monitor the Veteran's table. *Id.* at PageID.8. Plaintiff' also alleged that defendants Williams and Mashino were "derelict" by not steadfastly maintaining that plaintiff's conduct "immunized supervision's subsequent breaches of security and subsequent false termination reports -- that wrongly authorized "00" status from Classification Director." *Id.* Finally, plaintiff alleged that defendant Coucke caused the potential for serious injury or death when he "shared protected information" with a white prisoner by stating that plaintiff, a black prisoner, "spilled the beans." *Id.* at PageID.7.

Based on these allegations, plaintiff claims that defendants deprived him of substantive due process, violated his right to equal protection, engaged in "[a]ctionable deliberate

indifference," were negligent, and violated prison policy and the Michigan Whistleblowers' Protection Act. *Id.* at PageID. 7-9. Plaintiff also claims that his transfer to a new facility was a form of retaliation. *Id.* at PageID.8. As relief, plaintiff seeks damages of at least $500,000.00.

## II.     Defendants' motion for summary judgment

### A.     Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B. Failure to Exhaust

#### 1. Exhaustion requirement

The PLRA provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

5

### 2.     MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

### 3.     **Plaintiff did not properly exhaust the claims alleged in the complaint**

The record reflects that between May 2009 and April 23, 2015, plaintiff exhausted six grievances through Step III. *See* Jordan Garza Aff. (docket no. 13-3, PageID.72); MDOC Prisoner Step III Grievance Report (docket no. 13-3, PageID.74-75). However, none of these grievances involved the alleged incidents which occurred at LRF on September 14, 2011 (the stolen

6

handbag and strip search), September 22, 2011 (plaintiff's placement on unemployable status), or the alleged retaliatory transfer from LRF which occurred after November 22, 2011.

Four of the exhausted grievances involved incidents which occurred at the Muskegon Correctional Facility (MCF) in July, August and November, 2013. *See* MCF-13-07-1198-09c; MCF-13-08-1245-28j; MCF-13-08-1247-17z; and MCF-13-11-1560-17z (docket no. 13-3, PageID.73-99). These grievances are irrelevant to the present action, involving incidents at a different correctional facility which occurred approximately two years after the alleged incidents at LRF.

While plaintiff exhausted two grievances during his incarceration at LRF, neither involved the incidents alleged in this action. The first grievance, LRF-11-12-227-28a ("227"), involved an incident date of December 19, 2011. In this grievance, plaintiff complained that he received only "peripheral treatment" [sic] when he returned to his work assignment. Grievance 227 (docket no. 13-3, PageID.108). This grievance was rejected pursuant to Policy Directive 03.02.130 because it was as duplicative of a previous grievance. *Id.* at PageID.104-108. As discussed, the second grievance, no. 2233, involved an incident on December 29, 2011, in which plaintiff complained that defendant Cyr subjected him to personal abuse. Grievance 2233 at PageID.103.

Based on this record, plaintiff did not properly exhaust any grievances with respect to his claims arising from the September 14, 2011 incident, the September 22, 2011 incident, or the alleged retaliatory transfer. *See Jones,* 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91. Accordingly, defendants' motion for summary judgment should be granted.

### IV.     Recommendation

For these reasons, I respectfully recommend that defendants' motion for summary judgment (docket no. 12) be **GRANTED** and that this action be **TERMINATED**.


Entered: November 20, 2015                     /s/ Ray Kent
                                               RAY KENT
                                               United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).